UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REV. PATRICK J. MAHONEY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 04-cv-11649-NMG |
| ) | |
| TOM RIDGE, et al., ) | |
| ) | |
| Defendants. ) | |

DEFENDANTS' MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

The defendants Tom Ridge, et al., through their counsel, respectfully submit this

Memorandum of Law in opposition to plaintiffs' motion for injunctive relief.[1]  Plaintiffs'

motion should be denied because they cannot show a likelihood of prevailing on their

challenge to the constitutionality of the security restrictions being implemented by the

---

[1] The Complaint purports to sue various officials of the United States Secret Service ("Secret Service") in their official capacities under 42 U.S.C. § 1983.  Complaint ¶ 1.  The Complaint correctly characterizes the actions of the defendants as being taken in their official capacities.  However,  "Section 1983 applies to persons acting 'under color of state law' and not to persons acting pursuant to federal law."  Chatman v. D.E. Hernandez, 805 F.2d 453, 455 (1st Cir.1986).  Consequently, "§ 1983 cannot form the basis of an action against individuals acting under color of federal law."  Rogers v. Vicuna, 264 F.3d 1 (1st Cir. 2001).  In addition, the United States government has not waived its sovereign immunity with respects to actions brought directly under the Constitution.  Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000), citing FDIC v. Meyer, 510 U.S. 471, 486 (1994).  Federal officials sued in their official capacities enjoy the same sovereign immunity.  Rivera, 209 F.3d at 28; Tapia-Tapia v. Potter, 322 F.3d 742, 745-46 (1st Cir. 2003).  Accordingly, this Court lacks subject matter jurisdiction of the Complaint as pled.

Secret Service for the protection of Senator John Kerry and his spouse Teresa Heinz

Kerry ("Mrs. Kerry"). The decision of the Secret Service to exclude non-residents from

Pinckney Street and Louisburg Square is a reasonable, content-neutral restriction that is

narrowly tailored to achieve a significant governmental interest. Moreover, there are

ample alternative channels of communication for the plaintiffs and others to express their

views. The plaintiffs held a prayer vigil in front of the Kerry residence on Saturday, July

24, 2004, and the City of Boston has issued new permits to plaintiffs that allow them to

exercise their First Amendment rights just one block away from and in sight of the Kerry

residence. For all of these reasons, the defendants respectfully requests that the Court

deny the plaintiffs' motion for injunctive relief in its entirety.[2]

## BACKGROUND

The plaintiffs have brought this action seeking to enjoin the Secret Service from

preventing the plaintiffs from holding a prayer vigil outside the home of Senator John

Kerry and Mrs. Kerry. The Kerry residence is located at Louisburg Square, on Beacon

Hill in Boston, at the corner of Pinckney Street. Mrs. Kerry has most recently been in

residence since late Saturday, July 25, 2004. Declaration of David S. Horning ("Horning

Decl.") ¶ 4. Senator Kerry arrived in Boston last night and it is expected that he will be at

his residence on Wednesday. Id. As is well known, the 2004 Democratic National

---

[2] The government also notes that some of the plaintiffs may lack standing to bring
the instant suit. The Government reserves its right to further develop and advance the
standing argument when time and sufficient information permit.

Convention ("2004 DNC") is now in full swing, and it is expected that Senator Kerry will be nominated as the presidential candidate of the Democratic Party.

Pursuant to 18 U.S.C. § 3056(a)(7), the Secret Service is authorized to protect major presidential candidates and their spouses. Senator Kerry and his wife are currently receiving Secret Service protection under this authority. Horning Decl. ¶ 2. Special Agent David Horning of the Secret Service is the site agent for the Kerry residence and has been involved in determining the security arrangements there. Id. ¶ 1.

Beginning Sunday, the Secret Service has increased the level of protection provided at the Kerry residence, as a result of Mrs. Kerry's arrival and Senator Kerry's imminent arrival there and also the heightened security concerns arising from the 2004 DNC. Horning Decl. ¶ 4. The 2004 DNC has been designated a National Special Security Event. Id. ¶ 12; see 18 U.S.C. § 3056(e) (authorizing the Secret Service to participate in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President of the United States). Under the most recent security restrictions, the general public is excluded from Louisburg Square, and from Pinckney Street from Anderson Street (one block up the hill) to West Cedar Street (one block down the hill). Horning Decl. ¶ 5. Residents of Louisburg Square and the closed portion of Pinckney Street are allowed into the area, but only after the person's residency is confirmed. Guests are also allowed, again subject to

confirmation of their status, and commercial vehicles are allowed if they show that they are providing service to a resident of the area. Id.

On July 21, 2004, the City of Boston granted four Rally Permits to the Christian Defense Coalition and Operation Rescue for 50 to 200 people for four different times on Sunday, July 25 (two times); Monday, July 26; and Tuesday, July 27. The permits stated that the rally could take place on "Pinckney Street sidewalk opposite Louisberg [sic] Square, on public sidewalk only, subject to approval from U.S. Secret Service." Id. ¶ 7 and Exhibit 2 thereto. The discrepancy between the City permits and the Secret Service's security plans was brought to the attention of the Secret Service by the plaintiff Reverend Mahony on July 23, 2004. Horning Decl. ¶ 8. The City subsequently revoked the original permits and issued four revised permits. These permits authorize rallies at the same times, but at a new location, namely, "Pinckney Street, between Charles Street and West Cedar Street, on public sidewalk only, per national security request for U.S. Secret Service." Id. ¶ 9 and Exhibit 3 thereto. The intersection of Pinckney Street and West Cedar Street is one block down the hill from Louisburg Square, and the front door of the Kerry residence is plainly visible from that location. Id. ¶ 10. The front of the Kerry residence is also visible from sidewalk vantage points further down the hill toward Charles Street. Id. The public is also allowed on Mount Vernon Street, which runs parallel to Pinckney Street on the other end of Louisburg Square. Id. ¶ 8.

In determining the appropriate security arrangements for the Kerry residence for the week of the 2004 DNC, Special Agent Horning has taken into consideration a number of factors. Broader considerations include the fact that Senator Kerry is a major Presidential candidate and is very likely to be nominated as the candidate of the Democratic Party. These facts and the substantial national and media interest in the 2004 DNC and Senator Kerry's likely nomination makes him and his spouse more appealing targets of persons who would seek to harm either of them for one reason or another. Horning Decl. ¶ 12. Moreover, events since (and including) the attacks of September 11, 2001, have given rise to heightened concerns that terrorists may attack our democratic institutions. Id. The national conventions, and thus presidential candidates, are among our democratic institutions.

In developing the security plan for the Kerry residence, Agent Horning considered a variety of potential threats and structural safety issues. Id. ¶ 13. Pinckney Street and its sidewalks are narrow, and there is not enough distance between the street and sidewalks and the Kerry residence to mitigate the effects of a nearby explosion. Adequate distance is particularly important here due to the age and structural vulnerabilities of the homes in the area, including the Kerry residence. Id. A person on Pinckney Street carrying a backpack with a hidden explosive device could inflict extensive damage on the Kerry residence. Id. It is therefore necessary to prohibit the general public from Louisburg Square and Pinckney Street from West Cedar Street to Anderson Street.

Non-residents, and especially groups of people, must also be excluded because their presence could provide inadvertent cover for an individual seeking to carry out an attack. A crowd of people makes it much more difficult for law enforcement personnel to identify suspicious backpacks or concealed weapons. Id. A crowd of people near the residence would also make the location a more attractive target. Id.

The plaintiff Mahoney has asked that one or two women associated with his organization be allowed to come to the front of the Kerry residence to lay a bouquet of flowers. But making case-by-case exceptions to the security plan would be unworkable and would not fully achieve the Secret Service's objectives. Searches of pedestrians on the street may not reveal certain types of dangerous items such as biological or chemical weapons. In addition, it is inappropriate for the Secret Service to allow people into the area based on subjective judgments about their intentions or the message they wish to convey. Id. ¶ 16.

## STANDARD OF REVIEW

A temporary restraining order, like a preliminary injunction, is an "'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (discussing preliminary injunction standard) (emphasis in original); Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982); Yakus v. United States, 321 U.S. 414 (1944) (a preliminary injunction is extraordinary relief of a drastic nature). The burden of proof in

justifying an injunction is solely on the applicants; a defendant bears no burden to defeat

the motion. Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442-43 (1974).

In this Court "the criteria for the grant of a preliminary injunction are the familiar

four: (1) likelihood of success [on the merits], (2) risk of irreparable harm, (3) the balance

of equities and (4) the public interest." Pharmaceutical Research and Mfrs. of America v.

Concannon, 249 F.3d 66, 72 (1st Cir. 2001) (quoting Langlois v. Abington Hous. Auth.,

207 F.3d 43, 47 (1st Cir.2000) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,

102 F.3d 12, 15 (1st Cir.1996); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st

Cir. 1991). Courts do not have to weigh these four factors equally. McGuire v. Reilly,

260 F.3d 36, 51 (1st Cir. 2001). Although "[l]ikelihood of success is the touchstone of

the preliminary injunction inquiry," the other three factors "remain important." Vieques

Conservation and Historical Trust v. Bush, 140 F.Supp.2d 127, 130 (D. P.R. 2001).

Traditionally, a court exercises "'considerable discretion' in determining whether to grant

a preliminary injunction" so long as its decision is "supported by adequate findings of fact

and conclusions of law." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir.

1998) (quoting TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544-45

(1st Cir. 1996)).

Where, as here, the Plaintiffs seek a preliminary injunction  that will affect

government action taken in the public interest pursuant to a statutory authority, a critical

inquiry should be focused on balancing of the equities and the effect on the public

interest. <u>See</u> <u>Vieques</u>, 140 F.Supp.2d at 134; <u>No Spray Coalition v. City of New York</u>, 252 F.3d 148 (2d Cir. 2001).

## ARGUMENT

I. **THE PLAINTIFFS ARE UNLIKELY TO SUCCEED IN THEIR CLAIM THAT THE SECURITY RESTRICTIONS VIOLATE THEIR FIRST AMENDMENT RIGHTS**

### A. **Applicable First Amendment Principles**

The right to use public streets and sidewalks for assembly and communicating views is fundamental to the First Amendment. <u>See</u> <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983). It also is beyond cavil, however, that "[t]he privilege of a citizen of the United States to use the streets . . . for communication on views on national questions may be regulated in the interest of all." <u>Hague v. CIO</u>, 307 U.S. 496, 516 (1939); <u>see</u> <u>City Council of City of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. 789, 804 (1984) ("It has been clear since the Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest."); <u>United for Peace & Justice v. City of New York</u>, 323 F.3d 175, 176 (2nd Cir. 2003) (per curiam) ("[T]he right to use public forums such as streets for speech and assembly is not absolute."); <u>see also</u> <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 501 (1981) ("[A]t times First Amendment values must yield to other societal interests.").

8

Where, as here, the Government imposes a content-neutral restriction on speech in a public forum, courts apply the traditional "time, place, or manner" test for constitutionality. "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. For Creative Non-Violence, 468 U.S. 288, 293 (1984)); accord Virginia Pharm. Bd. v. Virginia Consumer Council, 425 U.S. 748, 771 (1976). The security restrictions implemented by the Secret Service for the Kerry residence easily meet this standard.

## B. The Secret Service's Security Plan Is Content-Neutral

The threshold inquiry for a valid "time, place, or manner" restriction is whether the restriction is "'based upon either the content or subject matter of speech.'" Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 648 (1981) (quoting Consol. Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 536 (1980)). This content-neutrality analysis ponders "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791.

The plaintiffs' apparent contention that the security plan discriminates based on the content of the plaintiffs' message is unfounded. As indicated in the Declaration of

9

Special Agent Horning, the Secret Service's security plan is totally neutral with regard to the content of anyone's message, and is based solely on legitimate security considerations. Horning Decl. ¶ 16. There is no merit to the plaintiffs' assertion (at pp. 7-8 of their memorandum) that the security measures discriminate on the basis of content because residents of the closed area of Louisburg Square and Pinckney Street are permitted to express their political views within the closed area, whereas non-residents such as the plaintiffs may not. "The critical question in determining content neutrality is not whether certain speakers are disproportionately burdened, but, rather, whether the reason for the differential treatment is – or is not – content-based." McGuire v. Reilly, 260 F.3d 36, 4 (1st Cir. 2001) (holding that Massachusetts Reproductive Health Care Facilities Act, which established floating buffer zones between reproductive health care facility and protesters, was content-neutral). "As long as a regulation serves a legitimate purpose unrelated to expressive content, it is deemed content-neutral even if it has an incidental effect on some speakers and not others." Id., citing Ward, 491 U.S. at 791, and Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 740 (1st Cir. 1995). Here, the obvious purpose of the challenged security measures is the security of Senator and Mrs. Kerry. This purpose is wholly unrelated to the content of any protected speech, and therefore it is content-neutral.

## C.    The Government's Interest Is Significant

There can be little doubt that the objective to be achieved by the Secret Service's

security measures – the protection of Senator and Mrs. Kerry – is significant.  In <u>Ward,</u>

the Supreme Court held that the City of New York, in requiring music bands to follow

certain guidelines in using a band shell in Central Park, had a significant interest in

protecting its residents from "unwelcome noise."  491 U.S. at 796-797.  In <u>Globe</u>

<u>Newspaper Co. v. Beacon Hill Architectural Comm.,</u> 100 F.3d 175, 187 (1st Cir. 1996),

the court held that a government commission's interest in preserving a district's aesthetic

character was a "significant government interest."  If protecting residents from

unwelcome noise and aesthetic insult is "significant" government interests, surely

protecting the safety of a major presidential candidate and his spouse is significant.

Protecting major presidential candidates and their spouses helps to ensure that our

democratic electoral process is not disrupted.  The Nation as a whole has an important

stake in ensuring that our presidential elections proceed smoothly.  <u>See also</u> <u>Watts v.</u>

<u>United States,</u> 394 U.S. 705, 707 (1969) ("The Nation undoubtedly has a valid, even an

overwhelming interest in protecting the safety of its Chief Executive and allowing him to

perform his duties without interference from threats of physical violence."); <u>Stigile v.</u>

<u>Clinton,</u> 110 F.3d 801, 804 (D.C. Cir. 1997) ("In addition to <u>actually</u> protecting the

11

President, the government also has an interest in assuring the public that it is taking every

possible precaution to ensure that he is safe.").[3]

## C.    The Security Plan Is Narrowly Tailored

In <u>Ward</u>, the Supreme Court clarified the "narrowly tailored" prong of First

Amendment jurisprudence:

> Lest any confusion on the point remain, we reaffirm today
> that a regulation of the time, place, or manner of protected
> speech must be narrowly tailored to serve the government's
> legitimate, content-neutral interests but that it need not be the
> least restrictive or least intrusive means of doing so.  Rather
> the requirement of narrow tailoring is satisfied 'so long as the
> . . . regulation promotes a substantial government interest that
> would be achieved less effectively absent the regulation.' . . .
> To be sure, this standard does not mean that a time, place, or
> manner regulation may burden substantially more speech than
> is necessary to further the government's legitimate interests.
> Government may not regulate expression in such a manner
> that a substantial portion of the burden on speech does not
> serve to advance its goals. . . .  So long as the means chosen
> are not substantially broader than necessary to achieve the
> government's interest, however, the regulation will not be
> invalid simply because a court concludes that the
> government's interest could be adequately served by some
> less-speech-restrictive alternative.

<u>Id</u>. at 799-800 (citations and quotation marks omitted; brackets in original).  In this

regard, a reviewing court should not second-guess the reasonable determination of the

responsible government official by means of a <u>de novo</u> assessment of whether there is

---

[3]  While these cases discuss the protection of a President rather than a Presidential
candidate, the statute authorizing protection, 18 U.S.C. § 3056(a), makes no distinction
between the Secret Service's authority with respect each class of protectee.

some other less intrusive means of achieving the government's objective. <u>Ward</u>, 491 U.S. at 797 ("The Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was 'the least intrusive means' of achieving the desired end.") and <u>id</u>. at 800 ("The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." (Brackets in original)); <u>accord</u> <u>Clark v. Cmty. For Creative Non-Violence</u>, 468 U.S. 288, 299 (1984); <u>see also</u> <u>Carew-Reid v. Metro. Transp. Auth.</u>, 903 F.2d 914, 917 (2d Cir. 1990) ("[I]f the scope of the regulation is not substantially broader than required to secure the governmental interest, the regulation is not invalid simply because a court, second-guessing the decisions of the governmental body, discerns some less-restrictive alternative to the regulation.").

The Secret Service's security measures easily pass the "narrowly tailored" test. The measures are spatially limited to Louisburg Square and two blocks of Pinckney Street. As explained in detail in the Declaration of Special Agent Horning, the spatial extent of the security measures are necessary to provide an adequate level of protection to the Kerry residence. <u>Cf.</u> <u>United For Peace & Justice v. City of New York</u>, 243 F.Supp.2d 19, 24 (S.D. N.Y.) (concluding City's ban on a march in front of the United Nations was narrowly tailored to the City's legitimate security concerns because "this march is simply

too large for the BPD to adequately secure the safety of the United Nations Headquarters"), aff'd per curiam, 323 F.3d 175 (2d Cir. 2003). The Secret Service, which has substantial expertise in the protection of individuals, has made reasonable determinations based on risks and the spatial and structural environment of the area. The Court should not second-guess those determinations. See Ward, 491 U.S. at797, 800.

The plaintiffs appear to argue that because they are peaceful and do not pose a threat, the restriction of location is impermissible. This argument does not overcome the legitimate restriction on large groups which create the security concerns described in the Horning Declaration, without regard to the intent of the principals. This argument ignores the well-settled principle that "the validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." Ward, 491 U.S. at 781; accord Clark v. Community for Creative Non-Violence, 468 U.S. 288, 296-97 (1983); Heffron, 452 U.S. 652; see White House Vigil for ERA Committee v. Clark, 746 F.2d 1518, 1534 n.106 (D.C. Cir. 1984) ("There is no suggestion, of course, that appellees or intervenors themselves would engage in activity that threatens the White House or its occupants. . . . We are concerned instead with persons who harbor less beneficent intentions.")

14

In sum, the security measures "directly further . . . legitimate governmental interests . . . and . . . those interests would [be] less well served in the absence of the [regulation]." Ward, 491 U.S. at 801.

**D.    The Ample Alternative Channels of Communication Available to the Plaintiffs**

The final element of the "time, place, or manner" test is whether ample alternative channels for communication have been left open. An "ample" alternative channel need not be an equivalent one. It does not mean that plaintiffs must have "access to every or even the best channels or locations for their expression." Carew-Reid v. Metropolitan Transp. Authority, 903 F.2d 914, 919 (2nd Cir. 1990). Nor does the ample alternative inquiry turn on whether the plaintiffs find the alternative to be as satisfying as the channel being proscribed; rather, an alternative channel will survive if plaintiffs receive sufficient opportunity to convey their views. See Housing Works, Inc. v. Kerik, 283 F.3d 471, 481–82 (2d Cir. 2002) ("That [plaintiff] considers no other City location as beneficial for its purposes as City Hall Plaza does not negate the fact that significant alternate channels are open for the messages it wishes to convey."); Globe Newspaper Comp. v. Beacon Hill Architectural Commission, 100 F.3d 175, 188 (1st Cir. 1996) (access to the intended audience need only be sufficient, not the best nor most ideal, to convey their message). See also United for Peace and Justice v. City of New York, 323 F.3d 175 (2d Cir. 2003) (per curiam) ("ample alternative channel" criterion met where group was allowed to hold a stationary rally at a location near the site where group wished to march).

15

The plaintiffs here have ample alternative channels of communicating their message. They have already held at least one prayer vigil in front of the Kerry residence when the enhanced security restrictions were not in place. See Horning Decl. ¶ 11. There is also a multitude of other locations and media through which the plaintiffs can publish their message. They can hold prayer vigils and rallies at other locations, and, in fact, the City of Boston has issued permits for them to hold rallies just one block away, at a location where plaintiffs can view the front door of the Kerry residence. See Exhibit 3 to Horning Decl. This is constitutionally adequate.

## II.  THE PLAINTIFFS CANNOT MEET THE OTHER CRITERIA FOR PRELIMINARY INJUNCTIVE RELIEF

The plaintiffs cannot show irreparable harm if an injunction is issued. Even assuming they could demonstrate a likelihood of success on the merits, they have ample alternative channels of communication by which they can convey their message. Accordingly, little or no harm will result from the denial of relief.

In addition, the balance of equities and public interest weigh against granting preliminary injunctive relief. The Nation has a strong interest in ensuring the safety of major Presidential candidates and their spouses. This important public interest weighs heavily against a grant of injunctive relief.

16

## CONCLUSION

For the reasons stated above, the defendants respectfully requests that the Court deny plaintiff's motion for injunctive relief in its entirety.

Respectfully submitted,

Michael J. Sullivan
United States Attorney

By: ~~Jennifer C. Boal~~

Jennifer C. Boal
George B. Henderson, II
Michael Sady
Assistant United States Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel.: (617)748-3100

Dated:  July 26, 2004

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon counsel for the plaintiffs, Thomas M. Harvey, by facsimile transmission and first class, postage prepaid mail this date.

Dated:   July 26, 2004

George B. Henderson, II
Assistant U.S. Attorney